2006 VT 127

# Thomas Montgomery v. Carl L. Devoid, Jr., Carl L. Devoid, Sr., Wayne M. Devoid, Leonard R. Devoid, Elizabeth M. Witham and the Leonard R. Devoid Revocable Trust

[915 A.2d 270]

No. 05-106

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed November 22, 2006

*Alan A. Bjerke* of *Bauer, Gravel, Farnham, Nuovo, Parker & Lang*, Burlington, for Plaintiff-Appellant.

*Richard R. Goldsborough* of *Perry, Schmucker & Goldsborough, PLLC*, South Burlington, for Defendant-Appellee Carl Devoid, Sr.

*Susan J. Flynn* of *Clark, Long, Werner & Flynn, P.C.*, Burlington, for Defendants-Appellees Leonard R. Devoid and the Leonard R. Devoid Revocable Trust.

*Christopher L. Davis, Kevin E. Brown* and *Peter F. Langrock* of *Langrock Sperry & Wool, LLP*, Middlebury, for Defendant-Appellee Elizabeth M. Witham.

¶ 1. **Reiber, C.J.** Following the theft of approximately $80,000 in cash from his residence in Underhill, Vermont, plaintiff Thomas Montgomery filed a civil suit to recover the money and named as defendants — in addition to the alleged thief, Carl Devoid, Jr. — several of Carl Jr.'s relatives. Montgomery's primary allegation was that each of the defendants was liable for the conversion of the stolen funds. After considering cross-motions for summary judgment on claims of conversion, fraud, and conspiracy, the Chittenden Superior Court determined that only some of the defendants were liable. Montgomery appealed, and one of the defendants cross-appealed. We affirm in part and reverse in part.

¶ 2. The defendants named in the complaint were: Carl Devoid, Jr., the alleged thief; Wayne Devoid, his brother; Carl Devoid, Sr., his father; Leonard Devoid, his now-deceased uncle; Elizabeth Witham, his uncle's partner; and the Leonard Devoid Revocable Trust. On May 20, 2002, Carl Jr. allegedly broke into Montgomery's home and stole, among other things, $80,000 in cash. The next day, Carl Sr. appeared at Witham and Leonard's home and asked them to help him conceal from the Internal Revenue Service money that he said he had earned doing a big siding and roofing job. According to Witham's deposition testimony from the following year, Carl Sr. suggested that he give the couple $10,000 in cash and, in exchange, they would write him two separate checks for $5,000, which he would deposit in his account and use to pay off a car loan. Witham testified that it "didn't seem wrong to be able to take cash and put it into our accounts, as long as he had worked for it." Accordingly, Witham and Leonard took the money from Carl Sr. and wrote out the checks to him that day. Carl Sr. later used the money to pay off the loan.

¶ 3. Two months later, on July 18, in response to a police investigation, Wayne Devoid told detectives that his brother, Carl Jr., had robbed the Montgomery home, that he had helped his brother count the money the same day as the robbery, and that Carl Jr. had purchased a number of expensive items, including two cars, with the stolen money. Records from the Department of Motor Vehicles revealed that Carl Jr. purchased one vehicle on the day of the burglary and one the day after. A further investigation and search of Carl Jr.'s residence the following week corroborated the details of Wayne's story and revealed recent purchases of four vehicles. The

police also recovered some of Carl Jr.'s property from his father, Carl Sr., who had removed it from Carl Jr.'s residence shortly before the police executed their search warrant. Carl Sr. admitted to the detective that he had taken some property out of Carl Jr.'s apartment over the weekend at Carl Jr.'s request. There was also evidence that Carl Sr. had stored at least two of the vehicles on his brother Leonard's property.

¶ 4. Wayne also told detectives that Carl Jr. had paid off his father's car loan. The Ford Motor Credit Company, which financed Carl Sr.'s 1999 Ford van, reported that on July 3, 2002, it received a payment of $10,931 in full satisfaction of the lien on the van. The police then interviewed Carl Sr., who told them that he had paid off the car loan with a loan from his brother, Leonard Devoid, and Leonard's partner, Elizabeth Witham.

¶ 5. According to Witham's deposition testimony, Witham and Leonard found out about the source of the money at some point between May 2002, when they deposited the cash and wrote the checks, and September 2002, when the police came to interview them. Witham testified that "one time while I was [gone] Carl Sr. came to our house and talked to Len and . . . Len questioned Carl and found out where that money came from. And Len told me that night." Upon hearing that information from Leonard, Witham contacted Carl Sr. and told him that she "was angry that he had put us in the middle. And we didn't know how to get out of it without getting him in trouble." Also, at some point during that summer, Leonard agreed to allow Carl Sr. to store some vehicles on his property.

¶ 6. On September 23, 2002, a detective came to Leonard and Witham's home to interview them. Fearing that Carl Sr. was in a lot of trouble and would go to jail if they told the truth, they stated that they had given him a $10,000 loan from cash they had saved for a vacation they never took. A later search of Witham and Leonard's bank accounts revealed that, during the week of May 20, each had made a $5000 cash deposit into their respective accounts and each had written a check to Carl Sr. for the same amount. The detective also informed Leonard that police had removed the vehicles Carl Sr. had stored at Leonard's property because they had been purchased with stolen money.

¶ 7. On January 10, 2003, Montgomery filed suit against Carl Devoid, Jr., Carl Devoid, Sr., Wayne Devoid, Leonard Devoid, Elizabeth Witham, and Leonard Devoid as Trustee of the Leonard

Devoid Revocable Trust, which had been established on May 17, 2002 and contained many of Leonard's and Witham's assets. On February 15, 2003, Leonard passed away, and he was never deposed. Carl Jr., Carl Sr., and Wayne Devoid all refused to answer most of the substantive questions at their respective depositions. Carl Sr. and Wayne cited the Fifth Amendment privilege against self-incrimination. In March 2004, Montgomery moved for summary judgment against all defendants, and Carl Sr., the Leonard Trust, and Witham each filed cross-motions for summary judgment.

¶ 8. The trial court issued a written order on February 16, 2005, concluding that: (1) neither Witham, Leonard, nor the Trust was liable for conversion; (2) Carl Sr. was liable for conversion as a matter of law, but only for $10,000 rather than the entire $80,000; (3) Carl Jr. and Wayne were liable for the conversion of the full $80,000. On appeal, Montgomery claims that the court erred in not assigning any liability to Witham, Leonard, and the Trust, and in restricting Carl Sr.'s liability to only $10,000. According to Montgomery, each of the defendants should be jointly and severally liable for the entire $80,000 loss. Witham, the Trust, and Carl Sr. each file responsive briefs, and Carl Sr. argues in a cross-appeal that the court erred in holding him liable for any amount. Carl Jr. and Wayne did not appeal from the court's judgment.

¶ 9. We review a summary judgment decision de novo. *White v. Quechee Lakes Landowners' Ass'n*, 170 Vt. 25, 28, 742 A.2d 734, 736 (1999). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . . show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." V.R.C.P. 56(c)(3); *State v. Therrien*, 2003 VT 44, ¶ 8, 175 Vt. 342, 830 A.2d 28. When there are cross-motions for summary judgment, "both parties are entitled to the benefit of all reasonable doubts and inferences." *Carr v. Peerless Ins. Co.*, 168 Vt. 465, 466, 724 A.2d 454, 455 (1998) (internal quotes òmitted). If there is a genuine issue of material fact, summary judgment may not serve as a substitute for a determination on the merits. *Human Rights Comm'n v. Benevolent & Protective Order of Elks*, 2003 VT 104, ¶ 11, 176 Vt. 125, 839 A.2d 576.

I.

¶ 10. We first consider the judgment against Witham, Leonard, and the Trust. The trial court evaluated the arguments against

Leonard and Witham by applying factors from the Restatement (Second) of Torts § 222A (1965), which we have followed, *P.F. Jurgs & Co. v. O'Brien*, 160 Vt. 294, 299-300, 629 A.2d 325, 329 (1993), to determine whether the couple's interference with Montgomery's money was serious enough to warrant liability for conversion. The court concluded that "the facts are insufficient to demonstrate that the dominion or control by Witham and Leonard rise to the level of conversion" because in their role as straw persons they did not exercise any control at all — or, to the extent that they did, only fleeting control — over the money that Carl Sr. gave them. According to the court, no evidence suggested that Witham or Leonard intended to exercise any control over the $10,000 or had any bad faith with respect to the transaction. The trial court also rejected Montgomery's claim of civil conspiracy for aiding and abetting the conversion, stating that to the extent the couple acted intentionally to perpetuate the conversion, it was only after the conversion took place, and they could not be liable for a type of retroactive conspiracy "merely because they were not forthright with the police after they concluded their fleeting and inadvertent involvement with the assets in question."

¶ 11. On appeal, Montgomery argues that Witham and Leonard are liable because: (1) they exercised dominion and control over the $10,000 by depositing the money into their bank accounts and writing checks on the funds; (2) Witham admitted that the couple agreed to the transaction for illegal purposes (concealing Carl Sr.'s assets so he could avoid paying taxes and not lose eligibility for government benefits); and (3) the couple lied to police about the transaction after learning of the true source of the funds, thereby aiding and abetting the conspiracy after the fact. Montgomery also argues that the Trust is liable because Leonard allowed Carl Sr. to store vehicles purchased with stolen funds on his property. Witham responds that she did not commit conversion because she had no knowledge of the source of the money at the time of the transaction with Carl Sr., she never exercised control over the funds, and she did not retain or benefit from the money. The Trust argues that Leonard never appropriated or exercised dominion over the money, but rather held it only briefly for another whom he believed to be its rightful owner. We conclude that the trial court did not err in granting summary judgment to Witham, Leonard, and the Trust on Montgomery's conversion and civil conspiracy claims.

## A.

■ ¶ 12. "To establish a claim for conversion, the owner of property must show only that another has appropriated the property to that party's own use and beneficial enjoyment, has exercised dominion over it in exclusion and defiance of the owner's right, or has withheld possession from the owner under a claim of title inconsistent with the owner's title." *O'Brien*, 160 Vt. at 299, 629 A.2d at 328; *Hegarty v. Addison County Humane Soc'y*, 2004 VT 33, ¶ 9, 176 Vt. 405, 848 A.2d 1139 (accord). "The key element of conversion, therefore, is the wrongful exercise of dominion over property of another." *O'Brien*, 160 Vt. at 299, 629 A.2d at 329. This Court's description of the tort of conversion is consistent with that of the Restatement (Second) of Torts § 222A(1), which defines conversion as "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel."[1]

■ ¶ 13. The Restatement, upon which this Court has relied in considering conversion claims, see *O'Brien*, 160 Vt. at 299-300, 629 A.2d at 329,[2] cites several factors for determining the seriousness of the

---

[1] Chattel is generally defined as tangible personal property, and not money. Black's Law Dictionary 251 (8th ed. 2004). Because of its historical roots, the tort of conversion traditionally applied only to tangible goods, but has since expanded to include intangibles merged in documents such as bonds, stock certificates, bills of exchange, *Lyon v. Bennington College Corp.*, 137 Vt. 135, 137, 400 A.2d 1010, 1012 (1979), money, and negotiable instruments, see 1 D. Dobbs, The Law of Torts § 66, at 149 (2001) ("Although conversion did not traditionally lie for taking paper money, the plaintiff had an action of some kind and today the action may well be called one for conversion."). Today it may be said that "when the defendant commits an affirmative act and physically takes control of particular paper monies he is guilty of conversion, even if the particular bills or coins cannot be identified." *Id.* § 63, at 132; cf. *Bender v. Bender*, 471 A.2d 335, 337-39 (Md. Ct. Spec. App. 1984) (affirming judgment for conversion against former wife who had money removed from former husband's safe shortly before divorce). Apart from a brief statement that Witham's attorney made for the first time at oral argument suggesting that money could not be the "corpus" of the conversion, none of the defendants have argued that conversion cannot apply to stolen money, and thus we do not address the issue in any depth. See *Will v. Mill Condo. Owners' Ass'n*, 2004 VT 22, ¶ 4, 176 Vt. 380, 848 A.2d 336 (arguments not raised or fairly presented to trial court are not preserved for appeal); cf. *Robertson v. Mylan Labs., Inc.*, 2004 VT 15, ¶ 1 n.2, 176 Vt. 356, 848 A.2d 310 (arguments raised for first time in reply brief need not be considered).

[2] Many other courts have applied § 222A in considering conversion cases. See, e.g., *Alaska Cont'l, Inc. v. Trickey*, 933 P.2d 528, 536 (Alaska 1997); *Focal Point, Inc. v. U-*

interference and the justice of imposing liability on the interfering party. Those factors include:

> (a) the extent and duration of the actor's exercise of dominion or control; (b) the actor's intent to assert a right in fact inconsistent with the other's right of control; (c) the actor's good faith; (d) the extent and duration of the resulting interference with the other's right of control: (e) the harm done to the chattel; (f) the inconvenience and expense caused to the other.

Restatement (Second) of Torts § 222A(2). "No one factor is always predominant in determining the seriousness of the interference, or the justice of requiring" full payment for the converted property, although courts consider "[n]ot only the conduct of the defendant, but also its consequences." *Id.* cmt. d. Generally, courts have limited liability for conversion "to those serious, major, and important interferences with the right to control the chattel which justify requiring the defendant to pay its full value." *Id.* cmt. c; see also 1 D. Dobbs, The Law of Torts § 64, at 137 (2001) ("The Restatement's principle is to declare a conversion when, but only when, the facts justify such an extreme remedy — when the defendant exercised quite extensive dominion over the chattel.").

¶ 14. Accordingly, we must decide whether Witham and Leonard intentionally exercised dominion or control over, and so seriously interfered with Montgomery's right to control, the stolen money such that they are justly liable for Montgomery's loss. In resolving this question, we examine each of the Restatement factors. As to the first factor — the extent and duration of the exercise of dominion and control — Witham and Leonard exercised total but fleeting control over the money when they accepted it from Carl Sr. and deposited it into their accounts. Although they technically had complete control over the money while it was in their accounts, they never considered

*Haul Co. of Ariz.*, 746 P.2d 488, 489 (Ariz. Ct. App. 1986); *People v. Wechsler*, 854 P.2d 217, 221 n.2 (Colo. 1993); *Luzar v. W. Sur. Co.*, 692 P.2d 337, 340 (Idaho 1984); *Larson v. Great W. Cas. Co.*, 482 N.W.2d 170, 174 (Iowa Ct. App. 1992); *Mauboules v. Broussard Rice Mills*, 379 So. 2d 1196, 1198 (La. Ct. App. 1980); *Keys v. Chrysler Credit Corp.*, 494 A.2d 200, 209 (Md. 1985); *LFC Leasing & Fin. Corp. v. Ashuelot Nat'l Bank*, 419 A.2d 1120, 1121 (N.H. 1980); *Hinkle v. Cornwell Quality Tool Co.*, 532 N.E.2d 772, 776 (Ohio Ct. App. 1987); *Beall Transp. Equip. Co. v. S. Pac. Transp.*, 64 P.3d 1193, 1196 (Or. Ct. App. 2003).

the money their own or acted as if they did. As far as they were concerned, their dominion and control over the money would last only as long as it took Carl Sr. to cash the checks. As it turned out, Carl Sr. held onto the checks for about one month. Nevertheless, the extent and duration of Witham and Leonard's agreed-upon control was minimal — they wrote checks to Carl Sr. on the day he gave them the cash. Not only was the couple's holding of the money temporary, but Montgomery has not demonstrated that the couple learned of the source of the money while it was in their possession.

¶ 15. The couple's lack of knowledge concerning the source of the money leads us to the second factor — Witham and Leonard's intent "to assert a right in fact inconsistent with the other's right of control." Restatement, *supra*, § 222A(2)(b). Without question, Witham and Leonard intentionally took the money, but they did not intend to assert actual dominion over the money for any length of time. Under their agreement with Carl Sr., they were to transfer the money from cash into checks immediately. Their actions conformed with that agreement. They did not consider the money to be their own, and thus they did not intend to assert a right in fact inconsistent with any other person's right of control.

¶ 16. The third factor is the actor's good faith. We have stated that the good-faith factor "is relevant only to the question of whether the converter intended to exercise dominion over the property." *O'Brien*, 160 Vt. at 300, 629 A.2d at 329. That comment, however, was part of a discussion rejecting good faith as a complete defense to liability. *Id.* at 299, 629 A.2d at 329 ("Specific intent to convert, that is, knowledge that the property is owned by another, is not required for liability in tort."). Other jurisdictions applying the Restatement factors have rejected good faith as a *defense* to a conversion claim but considered it as a *factor* in determining whether a defendant so seriously interfered with another's property that the defendant may justly be required to pay the full value of the property. See *Beall Transp. Equip. Co.*, 64 P.3d at 1197 (reaffirming that good faith may be considered as factor in determining whether alleged tortfeasor is liable for conversion); see also *Trickey*, 933 P.2d at 536 (citing intent and good faith as relevant factors in determining whether conversion occurred); *Kendall/Hunt Publ'g Co. v. Rowe*, 424 N.W.2d 235, 247 (Iowa 1988) (applying good-faith factor). We find this reasoning to be sound. We emphasize that one may be liable for conversion even absent knowledge that the property belongs to another; nevertheless, the good faith of the defendant, while not determinative in and of

itself, may be a factor in determining whether liability for conversion is appropriate.

¶ 17. Here, Witham and Leonard initially acted in good faith, at least with respect to the rightful owner of the cash, whom they did not know to exist at the time Carl Sr. came to them for the "loan." They took the money from Carl Sr. for the purpose of doing a favor for a family member. We recognize that they were helping Carl Sr. shield assets from tax liability and prevent the government from reducing his benefits, but any bad faith in that regard is unrelated to the question of their interference with Montgomery's right to the money. On the other hand, Witham and Leonard did not act in good faith in perpetuating the alleged conversion by lying to police after learning of the source of the money.

¶ 18. The fourth factor is the extent and duration of the resulting interference with Montgomery's right of control. Witham and Leonard's conduct in shielding the money Carl Sr. gave them was two steps removed from the initial conversion. Further, Montgomery has not indicated how that conduct, or the couple's later false statements to police, directly or significantly furthered the interference with his right of control over the stolen money. There is no suggestion that the sham transaction was a proximate cause of Montgomery's loss or delayed in any significant way the police investigation of the theft. Regarding the couple's cover-up, the police investigation had already led law enforcement to strong evidence implicating the primary tortfeasors, and Carl Sr. had already used the money to pay off his loan before the detective came to their house in September. Hence, Witham and Leonard's failure "to come clean" at that time did not significantly interfere with Montgomery's right of control.

¶ 19. For similar reasons, the fifth and sixth factors also weigh in favor of Witham and Leonard. There is no indication that the couple's conduct caused Montgomery additional harm, inconvenience, or expense. Although the theft of Montgomery's money undoubtedly caused him significant inconvenience and expense, the causal connection to Witham and Leonard is weak. All in all, the Restatement factors do not support the extreme remedy of imposing liability on Leonard and Witham for converting any portion of the cash stolen from Montgomery. See Restatement, *supra*, § 229 cmt. b (stating

that one should not be held liable for conversion where receipt of chattel is "temporary, trivial, or unimportant").

### B.

¶ 20. Montgomery's complaint also alleged a count of "conspiracy" against Witham and Leonard, among other defendants, for aiding and abetting the conversion after the fact by helping the tortfeasors conceal the stolen money. Montgomery argues on appeal that the superior court erred by requiring him to meet the burden of proving a criminal conspiracy. He contends that his actual claim is aiding and abetting another in the commission of a tort, which requires only that he show: "(1) the existence of a primary violation; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation." *Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 493 (S.D.N.Y. 2003). According to Montgomery, Witham and Leonard are jointly liable for aiding the conversion of his money because they exchanged the funds for Carl Sr. and later lied to police about it, and because Leonard stored vehicles purchased with the stolen funds on his property in Hinesburg.

¶ 21. We find no basis for overturning the superior court's summary judgment in favor of Witham and Leonard on Montgomery's civil conspiracy claim. Assuming that Montgomery has satisfied the first two elements set forth in *Calcutti*, he cannot demonstrate, for reasons similar to those discussed above, that Witham and Leonard provided "substantial assistance" to the tortfeasor in achieving the conversion. Closely intertwined with the concept of "substantial assistance" is the principle of proximate cause. *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 284 (2d Cir. 1992), *overruled on other grounds by Gerosa v. Savasta & Co.*, 329 F.3d 317, 327 (2d Cir. 2003). Given the couple's initial lack of knowledge regarding the source of the money, their fleeting control over the funds, and the relatively innocuous effect of their failure to later tell the police the truth about their transaction with Carl Sr., their conduct is too removed and tenuous to provide a necessary causal link for their assistance to qualify as substantial.

¶ 22. Moreover, we have held that "[a]ll who aid in the commission of a tort by another, or who approve of it after it is done, *if done for their benefit*, are liable in the same manner as they would be if they had done it with their own hands." *Dansro v. Scribner*, 108 Vt. 408, 411, 187 A. 803, 804 (1936) (emphasis added); see *Echelon*

*Homes, L.L.C. v. Carter Lumber Co.*, 683 N.W.2d 171, 179 (Mich. Ct. App. 2004) (stating that liability for assisting in conversion is "especially applicable where the defendant received benefit from the conversion and subsequently approved and adopted it"), *rev'd in part on other grounds*, 694 N.W.2d 544 (Mich. 2005). Here, the only benefit that Montgomery claims inured to Witham and Leonard is the satisfaction of aiding members of their family. The lack of any monetary benefit undoubtedly stems from the couple's apparent innocence in initiating, and insignificant role in perpetuating, the conversion. For all of the above reasons, the superior court did not err by granting summary judgment to Witham and Leonard with respect to Montgomery's claims of aiding and abetting a conversion.

## II.

¶ 23. Montgomery also argues that each of the defendants aiding and abetting the tortfeasor's conversion of his funds is jointly and severally liable for the entire amount taken — approximately $80,000. This issue is moot with respect to Witham and the Trust because we have affirmed the superior court's ruling that Witham and Leonard are not liable to any extent for the conversion of Montgomery's money; however, we must address the extent of Carl Sr.'s liability, if any, given the superior court's ruling that Carl Sr. is guilty of conversion of $10,000. Montgomery sought summary judgment against all of the defendants, including Carl Sr., for the entire $80,000. Carl Sr. opposed the motion and filed a cross-motion for summary judgment with respect to any amount exceeding $10,000, arguing that Montgomery failed to demonstrate a connection between him and any funds other than the $10,000 allegedly given to him by his son. The superior court granted summary judgment to Montgomery with respect to the $10,000 based on the undisputed fact that Carl Sr. took the $10,000 from his son knowing that it had been stolen, but granted summary judgment to Carl Sr. with respect to the remainder of the stolen money, ruling that Montgomery had not provided any evidence demonstrating that Carl Sr. otherwise aided his son in converting the stolen money or exercised control over any money other than the $10,000.

## A.

¶ 24. We first address Carl Sr.'s cross-appeal, in which he argues that the superior court erred by granting summary judgment to

Montgomery for conversion of the $10,000 that Carl Sr. allegedly received from his son. The undisputed facts supporting Montgomery's motion for summary judgment with respect to the $10,000 were that: (1) the day after Carl Jr. allegedly stole the $80,000 in cash from Montgomery, Carl Sr. arrived at Leonard's and Witham's home and gave them $10,000 in cash in exchange for two $5000 checks; (2) Carl Sr. told the couple that he had earned the money from a big job, but wanted to conceal it to avoid taxes and a reduction of government benefits; (3) Witham testified in a deposition that Carl Sr. later told Leonard about the true source of the money and Leonard relayed the information to her; (4) Witham testified that when she learned of the true source of the money, she was angry that Carl Sr. had gotten them involved and that she did not know how to get out of it without getting him into trouble; (5) during a police investigation, Witham and Leonard lied to police about Carl Sr. giving them the $10,000 because they were afraid Carl Sr. would go to jail if they told the truth; (6) Wayne Devoid, who allegedly helped his brother Carl Jr. count the money shortly after the burglary, told investigators that Carl Jr. had used part of the money to pay off Carl Sr.'s car loan; and (7) bank documents indicated that Carl Sr. paid off his car loan, which was approximately $10,000, within several weeks of receiving the checks from Leonard and Witham.

¶ 25. At his deposition, when asked about his knowledge of the Montgomery break-in or the source of the $10,000 that he had allegedly given to Witham and Leonard, Carl Sr. refused to answer any questions and invoked the privilege against self-incrimination contained in the Fifth Amendment to the United States Constitution. In his response to Montgomery's motion for summary judgment, Carl Sr. admitted telling Witham and Leonard that he wanted them to conceal $10,000 that he had earned so that he could avoid paying taxes, but he argued that Witham's deposition testimony was insufficient to support Montgomery's summary-judgment motion because it contained only inferences and innuendos suggesting that the $10,000 came from the Montgomery burglary. The court found Witham's deposition testimony admissible because both Carl Sr.'s statement to Leonard and Leonard's statement to Witham were nonhearsay admissions of party opponents, pursuant to Vermont Rule of Evidence 801(d)(2)(A). From the testimony, the court inferred that Carl Sr. had told Leonard that the money was from Carl Jr.'s theft so that Carl Sr. knew that neither he nor Carl Jr. was the rightful owner of the money.

¶ 26. On appeal, Carl Sr. contends that the superior court erred by granting summary judgment against him for $10,000 based on the evidentiary record before it. According to Carl Sr., Montgomery submitted only inferential evidence as to what Carl Sr. knew about the source of the $10,000 he gave to Witham and Leonard, insofar as Witham never actually stated in her deposition what Carl Sr. told Leonard regarding the money. Carl Sr. also argues that Montgomery never presented a "statement" that could be attributable to him, but rather provided only inferential evidence regarding what Carl Sr. knew about the source of the $10,000. In Carl Sr.'s view, Witham's deposition testimony regarding his conversation with Leonard cannot be deemed an admission under Rule 801(d)(2)(A) because it contained only inferences and no "statement."

¶ 27. We are unconvinced by these arguments. Rule 801(a) defines a "statement" as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion." Non-hearsay admissions by a party-opponent are governed by Rule 801(d)(2)(A), which "'makes no attempt to categorize the myriad ways in which a party . . . may make an admission. Admissions can be made expressly or may be inferred from conduct.'" 30B M. Graham, Federal Practice and Procedure § 7015, at 200 n.1 (2006) (quoting 4 Weinstein's Evidence ¶ 801(d)(2)(A)[01], at 801-239 (1990)). Thus, Witham's deposition testimony does contain statements as contemplated under Rule 801.

¶ 28. Moreover, while the party opposing summary judgment is entitled to the benefit of all reasonable doubts and inferences, see *Carr*, 168 Vt. at 466, 724 A.2d at 455, the *only* reasonable inference that can be drawn from the state of the record and the materials relied upon by Montgomery in support of his motion is that Carl Sr.: (1) received the $10,000 from Carl Jr. within a day of the theft at Montgomery's home, (2) knew that Carl Jr. had illegally obtained the money, and (3) attempted to launder the funds through Witham and Leonard. Further, that same evidence supports the conclusion — without requiring a full exposition of the Restatement factors — that Carl Sr.'s intentional exercise of dominion or control over the $10,000 so seriously interfered with Montgomery's right to control it that justice requires that Carl Sr. repay it.

¶ 29. Nevertheless, in his opposition to Montgomery's motion, Carl Sr. did not deny the allegations, but rather stated what he told

Witham and Leonard the day after the theft and argued that Montgomery's allegations against him required making inferences. Nor did Carl Sr. deny Montgomery's allegations at his deposition. Rather, he refused to answer any questions regarding his knowledge of the source of the $10,000. Under these circumstances, the superior court did not err in granting summary judgment against Carl Sr. for $10,000. See V.R.C.P. 56(e) ("When a motion for summary is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.").

¶ 30. While we may not make negative inferences from a person's decision to plead the Fifth Amendment privilege against self-incrimination, "the Fifth Amendment privilege cannot be invoked as a shield to oppose depositions while discarding it for the limited purpose of making statements to support a summary judgment motion." *Edmond v. Consumer Prot. Div.*, 934 F.2d 1304, 1308 (4th Cir. 1991); cf. *United States v. Sixty Thousand Dollars in U.S. Currency*, 763 F. Supp. 909, 914 (E.D. Mich. 1991) (holding that because claimant had asserted Fifth Amendment during discovery, he may not submit affidavits in opposition to government's motion for summary judgment). Confronted with evidence indicating that he had converted at least $10,000 of the money stolen from Montgomery, Carl Sr. cannot refuse to answer questions regarding the source of the money, and at the same time claim that the court is precluded from making the only reasonable inference possible from the evidence submitted in support of Montgomery's motion for summary judgment.

## B.

¶ 31. The remaining issue is whether Carl Sr. is liable for the entire $80,000 stolen from Montgomery's home. The trial court ruled that, with respect to any sums beyond the $10,000 Carl Jr. gave to Carl Sr., Montgomery failed to provide any evidence demonstrating that Carl Sr. otherwise aided his son in converting the funds or benefitted from exercising dominion or control over such funds. We conclude that material facts remain in dispute concerning Carl Sr.'s role in the alleged conversion — and thus the extent of his liability; accordingly, summary judgment was not appropriate. See *Carr*, 168 Vt. at 466, 724 A.2d at 455 (summary judgment is appropriate if there are no

genuine disputed issues of material fact and moving party is entitled to judgment as matter of law).

¶ 32. To be sure, "[c]ourts can hold that a tortfeasor is responsible only for some particular share or portion of the plaintiff's loss, no more." 1 D. Dobbs, The Law of Torts § 170, at 413; see Restatement (Second) of Torts § 433A ("Damages for harm are to be apportioned among two or more causes where (a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm."). Such an apportionment may be based on cause or comparative fault. Dobbs, *supra*, § 170, at 413.

¶ 33. On the other hand, "courts may conclude that no apportionment is rationally possible on the evidence or that apportionment is undesirable." *Id.* For example, "persons who act in concert, pursuant to a common plan or design" are made liable as joint tortfeasors for harm done by the others involved. *Id.*; see *Therrien*, 2003 VT 44, ¶ 24 (joint tortfeasors are those who act "'in concert . . . in pursuance of a common design'") (quoting W. Keeton et al., Prosser and Keeton on the Law of Torts § 46, at 322-23 (5th ed. 1984)); *Giguere v. Rosselot*, 110 Vt. 173, 181, 3 A.2d 538, 541 (1939) (whenever independent acts of several persons concur to produce single, indivisible injury that would not have occurred without such concurrence, each person is responsible for entire result and may be sued jointly and severally). A person is subject to liability for harm resulting to a third person from the tortious conduct of another if the person: (1) commits a tortious act as part of a common design with the other; (2) gives substantial assistance to the other knowing that the other's conduct is a breach of duty; or (3) gives substantial assistance to the other to accomplish a tortious result while also acting in a manner that is a breach of duty to the third person. Restatement (Second) of Torts § 876 (1979).

¶ 34. Here, Montgomery argues that Carl Sr. should be held liable for the entire $80,000 because he "was an active participant in the attempt to conceal the Plaintiff's property by laundering the funds and fraudulently making it appear to be a loan, as well as hiding vehicles purchased with the stolen funds at his brother's residence in Hinesburg." There is evidence in the record indicating not only that Carl Sr. received $10,000 of the stolen money the day after the burglary but also that he stored vehicles purchased with stolen money at Leonard and Witham's home, and also removed

several of the most valuable stolen items from Carl Jr.'s apartment at his son's request shortly before the police executed a search warrant. This evidence raises genuine issues of material fact as to his potential liability beyond the $10,000 he gave to Witham and Leonard. We therefore remand the matter for additional proceedings for the superior court to consider Montgomery's claim that Carl Sr. should be held jointly and severally liable for an amount in excess of the $10,000.

*Affirmed in part, and reversed and remanded in part.*